UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GREGORY A. HURST,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>ENPHASE ENERGY, INC., et al.,<br><br>　　　　　Defendants. | Case No. 20-cv-04036-BLF<br><br>**ORDER ON MOTIONS TO APPOINT LEAD PLAINTIFF AND APPROVE SELECTION OF LEAD COUNSEL**<br><br>[Re: ECF 12, 17] |

Now before the Court are dueling motions for appointment of lead plaintiff and approval of selection of lead counsel. ECF 12, 17. Based on the reasons discussed at the October 15, 2020 motion hearing and further explained below, the Court GRANTS Gregory Hurst's motion and DENIES Harish Varma Patchametla and Renuka Indukuri's motion.

## I.   BACKGROUND

On June 17, 2020, Plaintiff Gregory Hurst filed a securities class action suit in this Court alleging violations of various securities laws against Enphase Energy, Inc. ("Enphase"), Enphase CEO Badrinarayanan Kothandaraman, and Enphase CFO Eric Branderiz (collectively, "Defendants"). Compl., ECF 1. The complaint alleges that between February 26, 2019 and June 17, 2020 Defendants made materially false and misleading statements or failed to disclose material adverse facts, specifically that Enphase's domestic and international revenues were inflated, Enphase engaged in improper deferred revenue accounting practices, and Enphase's reported base point expansion in gross margins was overstated. *Id*. at ¶¶ 3-4. The complaint explains that on June 17, 2020, Prescience Point Capital released a report announcing, among other things, that

> financial statements filed with the SEC [by Enphase] are fiction. Based on our research, we estimate that at least $205.3m of [Enphase's] reported US revenue in FY 2019 was fabricated. Based on statements provided by former employees and other solar industry participants, it appears that the Company inflated its international revenue significantly as well. We also believe that most, if not all, of the enormous 2,080 Bps expansion in the Company's gross margin during [Defendant Badrinarayanan] Kothandaraman's tenure as CEO – from 18.4% in Q2 2017 to 39.2% in Q1 2020 – is fiction. We believe government bodies should investigate ENPH, Deloitte should launch an in-depth investigation of the Company's accounting practices, and the Board of Directors should establish an independent committee to examine the findings and analyses presented in this report.

*Id.* ¶ 5; *see also* ECF 28 at 4 fn. 4 (noting that the report was published at 9:30 am). Following the publication of the report, Hurst contends Enphase's stock price "plummeted from its June 16, 2020 closing price of $52.76 per share to a June 17, 2020 closing price of $39.04 per share, a one day drop of $13.72 or approximately 26%." *Id.* ¶ 6.

On August 17, 2020, Hurst filed a motion for appointment as lead plaintiff and approval of selection of counsel. ECF 12. That same day, Patchametla and Indukuri, a married couple, jointly moved for appointment as lead plaintiff and approval of selection of counsel. ECF 17.

## II. LEGAL STANDARD

### A. Lead Plaintiff

The Private Securities Litigation Reform Act of 1995 ("PSLRA") governs the procedure for selection of lead plaintiff in all private class actions under the Securities Exchange Act of 1934. 15 U.S.C. § 78u-4(a)(3). Pursuant to the PSLRA, the court shall appoint as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members," also referred to as the "most adequate plaintiff." *Id.* at § 78u-4(a)(3)(B)(i).

The PSLRA "provides a simple three-step process for identifying the lead plaintiff." *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002). First, the pendency of the action, the claims made,

2

and the purported class period must be publicized in a "widely circulated national business-oriented publication or wire service." *Id.*; *see also* 15 U.S.C. § 78u-4(a)(3)(A)(i)(I). This notice must be published within 20 days of the filing of the complaint. *Id.* It must also alert members of the purported class that they have 60 days to move for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

Second, the court must identify the presumptive lead plaintiff. To do so, the court "must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Cavanaugh*, 306 F.3d at 730. The court must then determine whether that individual, "based on the information he has provided in his pleadings and declarations," satisfies the requirements of Rule 23(a), "in particular those of 'typicality' and 'adequacy.'" *Id.* If the plaintiff with the largest financial interest satisfies these requirements, he becomes the "presumptively most adequate plaintiff." *Id.*; *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Finally, the other plaintiffs must have "an opportunity to rebut the presumptive lead plaintiff's showing that [he] satisfies Rule 23's typicality and adequacy requirements." *Cavanaugh*, 306 F.3d at 730. Unless a member of the purported plaintiff class provides proof that the presumptive plaintiff "(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class," the court must appoint the presumptively most adequate plaintiff as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also Cavanaugh*, 306 F.3d at 732.

**B. Lead Counsel**

Under the PSLRA, the lead plaintiff has the right, subject to court approval, to "select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). "[T]he district court should not reject a lead plaintiff's proposed counsel merely because it would have chosen differently." *Cohen v. U.S. Dist. Court*, 586 F.3d 703, 711 (9th Cir. 2009) (citation omitted). "[I]f the lead

3

plaintiff has made a reasonable choice of counsel, the district court should generally defer to that choice." *Id*. at 712 (citations omitted).

## III. DISCUSSION

### A. Procedural Requirements

Pursuant to the PSLRA, Block & Leviton LLP (on behalf of Hurst) published notice of the pending action on June 17, 2020 the same date the complaint was filed. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i); ECF 7 (notice of action). The notice announced the pendency of this action, listed the claims, specified the class period, and advised putative class members that they had 60 days from the date of the notice to file a motion to seek appointment as lead plaintiff in the lawsuit. *Id*. Thus, the notice complied with the PSLRA's requirements. *See* 15 U.S.C. § 78u–4(a)(3)(A). Plaintiffs filed both motions for appointment as lead plaintiff on August 17, 2020, the last day within the 60-day deadline. *See* ECF 12, 17. Both parties have therefore met the statutory notice requirements.

### B. Greatest Financial Loss

The Court must next identify the presumptive lead plaintiff—the prospective lead plaintiff with the greatest financial interest in the litigation. *See Cavanaugh*, 306 F.3d at 730. To determine which movant has the largest financial interest, the court "must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit" through "accounting methods that are both rationally and consistently applied." *Cavanaugh*, 306 F.3d at 730. Both movants have supplied information regarding shares purchased during the class period, the price of those shares, and their approximate losses.

Hurst purchased 6,100 shares of Enphase stock in four transactions between May 19-20, 2020. ECF 13 at Exh. B ¶ 3 (transactions). He sold all his stock in two transactions on June 17, 2020. *Id*. Hurst contends that he incurred a loss of $164,176.35 from his class period transactions,

4

ECF 12 at 6, which he calculated using the approximate losses suffered method. ECF 28 at 2; ECF 13 at Exh. C (loss calculations). Under this economic loss method, Hurst calculated his financial interest by subtracting the price at which he bought Enphase shares from the revenue he gained when he sold his shares. Patchametla and Indukuri contend that when applying the recoverable loss method, Hurst only had a financial interest of $71,086.35. *Id*. Hurst does not contest this calculation. ECF 29 at 5*; see generally* ECF 40.

Patchametla and Indukuri collectively purchased and sold 154,261 shares between March 12 and June 17, 2020. ECF 18 at Exh. B (transactions), Exh. C (loss charts). Patchametla and Indukuri often acted as day traders, purchasing and selling Enphase stock within the same day. For example, Indukuri purchased and sold 1,000 shares on March 18, 2020; 300 shares on April 14, 2020; 300 shares on April 15, 2020; and 1,000 shares on May 27, 2020. *See* ECF 18 at Exh. B. Similarly, Patchametla and Indukuri purchased and sold 12,800 shares on March 12, 2020; 2,200 shares on March 13, 2020; 3,500 shares on March 17, 2020; and 2,000 shares on March 19, 2020. *Id.* Of the Enphase shares they purchased within the class period, the duo sold all but 3,000 before June 17, 2020, the day of the alleged corrective disclosure. *See* ECF 45.

In their opening motion, filed simultaneously to Hurst's, Patchametla and Indukuri contend that they incurred a loss of $140,379.37 from class period transactions. ECF 17 at 1. In their motion in opposition to Hurst, however, they contend that they incurred a loss of $143,768.17 through the recoverable loss method. ECF 29 at 5. Patchametla and Indukuri do not explain the discrepancies in these figures. Hurst argues the earlier figure is based on economic loss, not recoverable loss, and that Patchametla and Indukuri's flip flopping taints their advocacy for the recoverable loss method. ECF 40 at 1 (citing *Bodri v. Gopro, Inc*., 2016 WL 1718217, at *3 (N.D. Cal. 2016)). The Court does not dwell on this discrepancy as it is not dispositive to the Court's ultimate conclusion below.

The Court now turns to the appropriate method for calculating their financial interest and,

consequently, which prospective lead plaintiff has the greatest financial interest. *See* ECF 28 at 3 (advocating for approximate loss method); ECF 29 at 1 (advocating for recoverable loss method). Neither the PSLRA, the Ninth Circuit nor the Supreme Court has endorsed any one method of calculating the largest financial interest. *See Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814, at *3 (N.D. Cal. Feb. 15, 2011) ("The only real guidance offered by the Ninth Circuit in *In re Cavanaugh* is that 'the court may select accounting methods that are both rational and consistently applied' in order to 'compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit.'") (citing *Cavanaugh*, 306 F.3d at 730 & n. 4). District courts have used methods to calculate financial interest falling into two main categories: those that "equate financial interest with actual economic losses suffered" and those that "equate[] largest financial interest with potential recovery." *See Perlmutter*, 2011 WL 566814, at *3. In other words, one method focuses on actual economic loss while the other focuses on recoverable damages.

Supreme Court and Ninth Circuit authority hints that courts should consider loss causation on a motion for appointment as lead plaintiff. In *Dura Pharm., Inc. v. Broudo*, the Supreme Court considered the Ninth Circuit's holding that a plaintiff can plead the loss causation required element of a securities fraud claim and overcome a motion to dismiss by alleging that the price the plaintiff paid for the security was inflated because of misrepresentation. 544 U.S. 336, 338 (2005). The Supreme Court reversed and held that "where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id*. at 346. A plaintiff alleging only that he sustained losses during the class period has not adequately stated a claim unless he also alleges that the defendant's fraud, as opposed to ordinary market forces, caused this loss. *Id*. This is because private securities fraud actions are intended "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id*. at 345. Although the Court did not formulate any specific

rule to identify damages caused by misrepresentations, the Court did observe that if a purchaser of fraudulently inflated stock sells his "shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id*. at 342.

The Ninth Circuit applied *Dura* in *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., holding that a plaintiff properly pleads loss causation by alleging that the market learned of and reacted to the allegedly fraudulent practices and by alleging that this reaction caused the plaintiff's loss. 540 F.3d 1049, 1063 (9th Cir. 2008). Similarly, in affirming an order granting summary judgment in *In re Oracle Corp. Sec. Litig*., the Ninth Circuit concluded that plaintiffs had failed to create a triable dispute as to loss causation, explaining that "[l]oss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." 627 F.3d 376, 392 (9th Cir. 2010) (citing *Metzler*, 540 F.3d at 1063).

Courts in this district nonetheless have adopted a range of *Cavanaugh*-approved approaches in calculating the financial interest of each plaintiff. *Mulligan v. Impax Labs., Inc.*, 2013 WL 3354420, at *4-*6 (N.D. Cal. 2013) (reviewing different methods). This variation derives, in part, from the fact that during this early stage of litigation, methods for estimating financial loss necessarily involve some level of speculation. Considering the guidance of *Dura*, *Metzler*, and *In Re Oracle Securities Litigation* that recoverable losses must be traceable to the alleged fraud instead of ordinary market forces, along with the factual circumstances alleged in this case, the Court is satisfied that the recoverable loss method is the most appropriate method to apply here in appointing lead plaintiff. While loss causation in some securities cases can prove onerous, for example where there are multiple partial corrective disclosures over a long period of time, such is not the case here. Plaintiffs allege a single, discrete, corrective disclosure, namely the Prescience Point Capital Report.

"When a single disclosure reveals a purported fraud, there is a constant fraud premium

across the class period, meaning that the artificial inflation of the price of the security did not dissipate." *Markette v. XOMA Corp.*, 2016 WL 2902286, at *6 (N.D. Cal. 2016) (citing *Mulligan*, 2013 WL 3354420, at *6). In these situations, methods focusing on recoverable loss are preferable to economic loss methods "because [they] exclude[] losses incurred during the class period that are likely attributable to normal market fluctuations rather than fraud." *Id.* Such is the case here. The Prescience Point Capital Report was published on June 17, 2020. Compl. ¶¶ 5, 37. Between the market close on June 16, 2020 and the market close on June 17, 2020, the stock price dropped $13.72 from $52.76 to $39.04. *Id.* ¶ 6. The Court finds that, on these facts, the recoverable loss method most accurately establishes the prospective lead plaintiffs' financial interest. Under this method, Patchametla and Indukuri have the greatest financial interest and Hurst has the second greatest financial interest.

### C. Rule 23 Requirements

Upon determining the movant with the largest financial interest, the court "must then focus its attention on that plaintiff and determine ... whether he satisfies the requirements of Rule 23(a)." *Cavanaugh*, 306 F.3d at 730; *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). Rule 23(a) requires satisfaction of four factors to serve as a class representative:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The typicality and adequacy requirements of Rule 23 are the main focus of this determination. *See Cavanaugh*, 306 F.3d at 730. Examination of the remaining requirements is deferred until the lead plaintiff moves for class certification.

The plaintiff with the largest financial stake in the controversy that preliminarily satisfies the typicality and adequacy requirements is presumed to be the "most adequate plaintiff." *Cavanaugh*, 306 F.3d at 730. The adequacy requirement is met if there are no conflicts between

8

the representative and class interests and the representative's attorneys are qualified, experienced, and generally able to conduct the litigation. Fed. R. Civ. P. 23(a)(4); *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.2003). The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992) (citing *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985)).

As determined above, Patchametla and Indukuri are the plaintiffs with the largest financial stake in the controversy. The duo presumably meets the adequacy requirement because there is no evidence that Patchametla and Indukuri are antagonistic to the class members and they have selected counsel that has significant experience in securities class action cases. *See* ECF 17 at 6-9. Patchametla and Indukuri also share substantially similar questions of law and fact with the members of the class because the claims arise from the same alleged course of conduct by defendants. *Id*. Their claims are presumptively typical of the members of the class. Thus, Patchametla and Indukuri are the presumptive lead plaintiffs.

The Court must then "give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Cavanaugh*, 306 F.3d at 730 (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)). The presumption of adequacy "may be rebutted only upon proof ... that the presumptively most adequate plaintiff" does not satisfy the adequacy or typicality requirements of Rule 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *Cavanaugh*, 306 F.3d at 729 fn. 2. If the presumptive lead plaintiff does not meet the typicality or adequacy requirement, the court determines whether the plaintiff with the next highest stake in the litigation has made a prima facie showing of typicality and adequacy. *Cavanaugh*, 306 F.3d at 731. "If so, it must declare that plaintiff the presumptive lead plaintiff and repeat step three of the process by giving other plaintiffs an opportunity to rebut that showing. This process must be repeated sequentially until all challenges have been exhausted." *Id*.

The Court accordingly considers whether Hurst can rebut Patchametla and Indukuri's showing that they satisfy Rule 23's typicality and adequacy requirement.

### a. Patchametla and Indukuri

Hurst points to two defects from which he believes Patchametla and Indukuri suffer. ECF 28 at 4-9. First, he argues that the vast majority of Patchametla and Indukuri's losses derive from purchases made after the fraud's disclosure on June 17, 2020. ECF 28 at 4-7. Second, he argues that Patchametla and Indukuri are day traders, subjecting them to unique defenses and defeating their typicality. ECF 28 at 7-9.

The Court rejects Hurst's first objection. Courts in this district have found that class representatives who purchase shares after the revelation of a fraud are not necessarily atypical. *See, e.g. In re Montage Group Limited Sec. Litig.*, 2016 WL 1598666, at *4 (N.D. Cal. 2016); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576 (N.D. Cal. 2009); *In re Providian Fin. Corp. Sec. Litig.*, 2004 WL 5684494, *4-5 (N.D. Cal. 2004); *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 719 (C.D. Cal. 2002). Investors who make share purchases after the disclosure of the fraud may be rendered atypical if the timing of trades makes their behavior unique. *See Montage*, 2016 WL 1598666, at *4 ("Defendants have not explained why the timing of Graham's trades makes his behavior unique."); *Connetics*, 257 F.R.D. at 576–77 (N.D. Cal. 2009) ("Defendants do not explain why the timing of lead plaintiff's purchases automatically make it unique . . . "); *Providian,* 2004 WL 5684494, at *5 ("The fact that [lead plaintiff] may be subject to a defense of non-reliance is not a reason to deny class certification unless the facts giving rise to the defense make the plaintiff atypical.").

Hurst argues that Patchametla and Indukuri's behavior is unique because the duo "bought 25,000 Enphase shares after the initial Prescience Point report was published and after the Enphase's stock price began to drop" and that without losses flowing from these trades, the couple actually made money on their class period transactions. ECF 28 at 5-6. Patchametla and Indukuri respond that Hurst himself defined the class period to include June 17, 2020. ECF 41 at 3-4. They

10

also argue that "potential 'intra-class conflicts relating to the times at which particular class members purchased their securities...relate to damages' and do not render Movants atypical." ECF 41 at 4 (quoting *Connetics*, 257 F.R.D. at 578).

The Court declines, at this stage, to parse through the timing of each of Patchametla and Indukuri's Enphase stock purchases and sales on June 17, 2020 to speculate which transactions were made with reliance on Defendants' statements and which occurred with knowledge of the Prescience Point Capital Report. Hurst cites *In re Snap Sec. Litig.*, 2019 WL 2223800 (C.D. Cal. 2019), to rebut the Patchametla and Indukuri's presumption of reliance. But there, the court found that the presumptive lead plaintiff was subject to unique defenses where approximately 60% of his stock purchases were made after the alleged misrepresentation was revealed. *Id.* at *2. Only 16% of the couple's class period transactions occurred on June 17, 2020. *See* ECF 41 at 5. And Patchametla and Indukuri proffered evidence that they traded in large volumes on other days, such as March 18, 2020 where they purchased 43,091 shares. ECF 46. Hurst, as the architect of the complaint, defined a class period between February 26, 2019 and June 17, 2020—not between February 26, 2019 and the time the Prescience Point Capital Report was published on June 17, 2020. *See Evellard v. LendingClub Corp.*, 2016 WL 9108914, at *3 (N.D. Cal. Aug. 15, 2016) ("[A]n important consideration in selecting the lead plaintiff is to estimate the class period. Lead plaintiff candidates will typically stretch or shrink the class period in order to jockey for position so as to wind up with the largest loss."). Hurst has made his bed and now he must lie in it.

Hurst' second objection is that Patchametla and Indukuri are subject to unique defenses as in-and-out, or day, traders. ECF 28 at 7-9. The couple argues that their status as in-and-out traders does not make them atypical, and looks to *In re Zynga Inc. Sec. Litig.*, 2013 WL 257161 (N.D. Cal. 2013), *Ruland v. InfoSonics Corp.*, 2006 WL 3746716 (S.D. Cal. 2006), and *Serafimov v. Netopia, Inc.*, 2004 WL 7334061 (N.D. Cal. Dec. 3, 2004) for support. ECF 41 at 5.

In-out traders are those who "purchased stock during the period of misrepresentation but

11

sold it before any disclosure which either partially or completely corrected the misrepresentation." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987), *overruled on other grounds by Holligner v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990). Courts have long recognized an inherent conflict between the interests of day or in-and-out traders and those of retention traders. *See, e.g., Applestein v. Medivation Inc*, 2010 WL 3749406, at *3 (N.D. Cal. 2010) ("Day-traders typically focus on technical price movements rather than price, and therefore are subject to a defense th[at] they would have purchased the stock at issue regardless of the misstatement/omission.") (internal quotation marks and alteration omitted); *In re Seagate Technology II Securities Litigation*, 843 F.Supp. 1341, 1359 (N.D. Cal. 1994) ("[An] in/out plaintiff's interest lies in minimizing the degree of price inflation existing at the date of sale. A retention plaintiff buying on that date ... has an exactly opposite interest ... [and] would seek to maximize the degree of price inflation existing on that date.").

"District Courts in the Ninth Circuit have been in conflict with each other over whether in-and-out traders are appropriately included in a class." *McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 699 (W.D. Wash. 2010). "Proof of causation of economic loss is an element of a cause of action for securities fraud." *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) (citing *Dura*, 544 U.S. at 338). "Thus, in order to determine whether in-and-out traders should remain part of the proposed class, it is necessary to demonstrate that they might be able to prove a loss, i.e., damages." *Id*. (quoting *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006)). Courts that have included day traders within a class have done so where it is ambiguous as to whether investors relied on an alleged corrective disclosure or on other ordinary market information. *Buttonwood Tree Value Partners, LP v. Sweeney*, 2013 WL 12125980, at *15 (C.D. Cal. Sept. 12, 2013) ("it remains an open question as to whether the [first-in-time disclosure currently identified by the parties] was [indeed] the first corrective disclosure, or the first time damages occurred") (internal quotation marks omitted, alterations in original). *see also In re*

*UTStarcom, Inc. Sec. Litig*., 2010 WL 1945737, at *11-12 (N.D. Cal. 2010) (excluding in-out traders who sold their stock before the first partial corrective disclosure, but including in-and-out traders who sold their stock between any two subsequent partial corrective disclosures).

In *Eichenholtz v. Verifone Holdings, Inc.*, as here, the court considered dueling lead plaintiff motions where one prospective lead plaintiff argued that another prospective lead plaintiff should be deemed atypical because of its day trading activity. 2008 WL 3925289, at *10-11 (N.D. Cal. 2008). The court agreed, concluding that the day trading plaintiff "may be subject to a unique defense regarding its reliance upon publicly available information," and denying its bid to become the lead plaintiff. *Id*. at *11. The court explained that "[t]his day-trader would not be typical of the class because the class's damages stem from reliance upon the company's [misrepresentations], not upon daily market volatility. *Id*.; *see also Reinschmidt v. Zillow, Inc.*, 2013 WL 1092129, at *4 (W.D. Wash. 2013) (finding a day trading prospective lead plaintiff may be subject to unique defenses because "[r]eliance on the fraud or misrepresentation is an essential element of a federal securities claim"); *Applestein*, 2010 WL 3749406, at *3 ("The record before the court may be insufficient to establish that Schindler was a day-trader qua day-trader. It is sufficient, however, to raise serious concerns about his typicality and about his susceptibility to the defense that he was trading in response to information other than the alleged misstatements and omissions made by [defendant].").

Here, the complaint alleges just one corrective disclosure—the June 17, 2020 Prescience Point Capital Report. Thus, only those who held Enphase stock through that date were harmed by the Defendants' alleged fraud. Investors who bought or acquired Enphase stock during the proposed class period, but sold the stock prior to June 17, 2020, would not have suffered injury from the fraud because they would have also sold the stock at an alleged artificially inflated price. Instead, any loss or gain from such a sale would be traceable to ordinary market forces. *See Dura*, 544 U.S. at 342 (where a purchaser of fraudulently inflated stock sells his "shares quickly before

13

the relevant truth begins to leak out, the misrepresentation will not have led to any loss"). Patchametla and Indukuri sold the lion's share of their class period Enphase stock acquisitions prior to June 17, 2020. As such, the Court has serious concerns about their vulnerability to a defense that they were trading in response to information other than the alleged misstatements and omissions made.

The cases Patchametla and Indukuri cite do not provide the couple with an escape hatch from this conclusion. *Serafimov v. Netopia, Inc*. was decided without the benefit of the Supreme Court's reasoning in *Dura*. 2004 WL 7334061, at *5-*6. As this Court discussed extensively above, in *Dura* the Supreme Court made clear that an inflated stock purchase price due to deception or misrepresentation does not in and of itself constitute or proximately cause the relevant economic loss. At the moment the transaction takes place, the plaintiff has suffered no loss because the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. *Id*. at 343. If the purchaser sells the shares before the truth becomes known, the misrepresentation will not have led to any loss. *Id*. And in *In re Zynga Inc. Sec. Litig*., the court adopted the holding in *Serafimov* without comment on the changes in caselaw ushered in by *Dura*. 2013 WL 257161, at *2 ("the Court finds that whether [prospective lead plaintiff] is a day trader is inconsequential to his request to be appointed lead plaintiff"). Finally, *Ruland v. InfoSonics Corp*. cuts against the pair's argument. 2006 WL 3746716. There, during the financial interest calculation stage, the court declined to consider any losses suffered or gains accrued by a prospective lead plaintiff prior to the first alleged corrective disclosure, reasoning that these gains or losses would not be attributable to the alleged fraud. *Id*. at *5; *see also In re McKesson HBOC, Inc., Sec. Litig*., 97 F.Supp.2d 993 (N.D. Cal. 1999) (holding that it was inappropriate to count losses or profits by "in-and-out" traders and assuming a constant fraud premium despite movant's argument that partial disclosures may have begun seeping into the pool of information available to the investors).

Patchametla and Indukuri cannot have it both ways. They cannot both advocate that the Court rely on the reasoning in *Dura* in calculating financial interest but disavow *Dura*'s implications for the typicality of their claims. Because the Court finds Patchametla and Indukuri suffer from unique defenses, Hurst has successfully rebutted the presumption that Patchametla and Indukuri will be the lead plaintiffs. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii).

### b. Hurst

The Court next considers whether Hurst, who has the second largest financial interest in this suit, qualifies as "the presumptively most adequate plaintiff." *Cavanaugh*, 306 F.3d at 730 ("If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23."). Hurst presumably meets the adequacy requirement because there is no evidence he is antagonistic to the class members and he has selected counsel that has significant experience in securities class action cases. *See* ECF 12 at 6-7. Hurst also shares substantially similar questions of law and fact with the members of the class because the claims arise from the same alleged course of conduct by defendants. *Id*. His claims are presumptively typical of the class members, qualifying him as the presumptive lead plaintiff.

In their attempt this rebut this presumption, Patchametla and Indukuri argue that Hurst's challenge to their lead plaintiff motion amounts to a willingness to "sell out the Class by conceding to Defendants a not-yet-asserted, much less proven, affirmative defense that the losses Class Members incurred prior to the full assimilation of the alleged fraud on the market were not caused by Defendants' misstatements or omissions." ECF 41 at 2. The Court disagrees. The Ninth Circuit has acknowledged that this stage of the lead plaintiff identification process is inherently "adversarial." *Cavanaugh*, 306 F.3d at 730. That Hurst followed statutory procedures does not doom his motion for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) ("The

15

presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class . . . ").

The Court has thus found, in Hurst, the plaintiff with the largest financial stake who fulfills the requirements of Rule 23.

### D. Lead Counsel

No parties have objected to Hurst's selection of Block & Leviton LLP as lead counsel. The Court has reviewed the resume of the firm and is satisfied that Hurst has made a reasonable choice of counsel. *See* Block & Leviton LLP firm resume, ECF 13, Exh. D. Accordingly, the Court APPROVES Hurst's selection of Block & Leviton LLP as lead counsel.

## IV. ORDER

For the foregoing reasons, Hurst's motion to appoint lead plaintiff and approval of selection of counsel at ECF 12 is GRANTED. The competing motion at ECF 17 is DENIED.

Dated: November 30, 2020

_____
BETH LABSON FREEMAN
United States District Judge