Whitney E. Street (CA Bar No. 223870)
**BLOCK & LEVITON LLP**
100 Pine Street Suite 1250
San Francisco, CA 94111
Tel.: (415) 968-1852
Fax: (617) 507-6020
whitney@blockleviton.com

Jacob A. Walker (CA Bar No. 271217)
**BLOCK & LEVITON LLP**
260 Franklin St., Suite 1860
Boston, MA 02110
Tel.: (617) 398-5600
Fax: (617) 507-6020
jake@blockleviton.com

*Attorneys for Lead Plaintiff Gregory A. Hurst*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| GREGORY A. HURST, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>v.<br><br>ENPHASE ENERGY, INC., BADRINARAYANAN KOTHANDARAMAN, and ERIC BRANDERIZ,<br><br>　　　Defendants. | No. 5:20-cv-04036-BLF<br><br>**CLASS ACTION**<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Date: July 29, 2021<br>Time: 9:00 a.m.<br>Ctrm.: 3, 5th Floor<br><br>The Hon. Beth L. Freeman |

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     STATEMENT OF FACTS .........................................................................................2

        a.      Enphase's fall and "magic" recovery. ........................................................2

        b.      Enphase's explosive growth. ......................................................................3

        c.      The Prescience Report reveals the truth to the market. ............................3

III.    LEGAL STANDARD..................................................................................................5

IV.     ARGUMENT ..............................................................................................................6

        a.      Plaintiff has pleaded materially false statements of fact...........................7

                i.      Defendants' premature recognition of deferred revenue is an
                        actionable GAAP violation, not a matter of "opinion." ..............7

                ii.     Plaintiff has adequately pleaded an undisclosed related party
                        transaction. ..................................................................................11

                iii.    The statements of former employees are sufficiently corroborated
                        by other facts...............................................................................11

        b.      Plaintiff has adequately pleaded scienter...............................................15

                i.      The enormity of Enphase's GAAP violations contributes to a
                        strong inference of scienter........................................................16

                ii.     Unusual stock sales by Enphase insiders and Kothandaraman's
                        compensation scheme contribute to a strong inference of scienter. ..........17

                iii.    Statements directly implicating Defendants contribute to a strong
                        inference of scienter. ..................................................................20

                iv.     Numerous red flags contribute to a strong inference of scienter...............21

        c.      Plaintiff has adequately pleaded Loss Causation....................................22

        d.      Plaintiff has adequately alleged a Section 20(a) claim. .........................25

V.      CONCLUSION..........................................................................................................25

## TABLE OF AUTHORITIES

**CASES**

*Acticon AG v. China N. E. Petroleum Holdings, Ltd.*,
    692 F.3d 34 (2d Cir. 2012) .............................................................................. 25

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ............................................................................. 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................... 5

*Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-CV-01795-WHO,
    2016 WL 2937483 (N.D. Cal. May 20, 2016) ................................................. 23

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ........................................................... 13

*Brown v. China Integrated Energy, Inc.*,
    875 F. Supp. 2d 1096 (C.D. Cal. 2012) ........................................................... 12

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
    964 F. Supp. 2d 1128 (N.D. Cal. 2013) ........................................................... 21

*Communs. Workers of Am. Plan for Emples. Pensions & Death Bens. v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) ........................................................... 16, 18, 19, 21

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ......................................................................... 22

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK),
    2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ..................................................... 7

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ....................................................................... 23, 24

*In re Cardinal Health, Inc. Sec. Litigs.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................ 20

*In re China Educ. All., Inc. Sec. Litig.*, No. CV 10-9239 CAS JCX,
    2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ............................................ 11, 14, 21, 23

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996) .............................................................. 7, 8

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .................................................................... passim

*In re Herbalife, Ltd. Sec. Litig.*, No. CV 14-2850 DSF JCGX,
  2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) ................................................................. 23

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230  (N.D. Cal. 2008) ................................................................. passim

*In re Levi Strauss & Co. Sec. Litig.*,
  527 F. Supp. 2d 965 (N.D. Cal. 2007) ............................................................................ 10

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214 HB,
  2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ...................................................... 13, 14, 17, 21

*In re MF Glob. Holdings Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................................ 7

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................................... 8, 17

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015) ......................................................................... 5, 11

*In re Obalon Therapeutics, Inc.*, No. 3:18-CV-0352-AJB-WVG,
  2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) ................................................................. 9

*In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG,
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ................................................................... 25

*In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-cv-5146-CAS (JEMx),
  2019 WL 1512269 (C.D. Cal. Mar. 25, 2019) ......................................................... 10, 17

*In re Synchrony Fin. Sec. Litig.*, No. 20-1352,
  2021 WL 560204 (2d Cir. Feb. 16, 2021) ..................................................................... 6, 15

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) .................................................................................. 17

*Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK,
  2020 WL 7261314 (N.D. Cal. Dec. 10, 2020) ............................................................... 13

*Lea v. TAL Education Group*, No. 19-3549,
  2020 WL 6937475 (2d Cir. Nov. 25, 2020) ....................................................... 16, 17, 23

*Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC,
  2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ............................................................... 14

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) ................................................................................ 8

*McIntire v. China Mediaexpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)................................................................................. 12

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ......................................................................................... 23

*Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)...................................................................... 11, 12, 13

*Miller v. PCM, Inc.*, No. LACV 17-3364-VAP (KSx),
    2018 WL 5099722 (C.D. Cal. Jan. 3, 2018) ...................................................................... 23

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ............................................................................................. 22

*New Mexico State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) ........................................................................................... 15

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................................. 18

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................................................... 12

*Or. Pub. Emples. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ............................................................................................. 23

*Pearlstein v. BlackBerry Ltd.*,
    93 F. Supp. 3d 233 (S.D.N.Y. 2015)..................................................................................... 7

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*,
    411 F. Supp. 2d 1172 (N.D. Cal. 2005) ............................................................................. 25

*Rieckborn v. Jefferies LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015) ................................................................................... 7

*S. Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ............................................................................................. 15

*Sayce v. Forescout Technologies, Inc.*, No. 20-CV-00076-SI,
    2020 WL 6802469 (N.D. Cal. Nov. 19, 2020) ................................................................... 23

*SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C 18-02902 WHA,
    2019 WL 2491935 (N.D. Cal. June 14, 2019) .............................................................. 13, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................................ 16

*Wochos v. Tesla, Inc.*, No. 19-15672,
2021 WL 246210 (9th Cir. Jan. 26, 2021) ........................................................................ 25

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ............................................................................................ 12

**STATUTES**

15 U.S.C § 78j.......................................................................................................................... 1

15 U.S.C. § 78t(a) ................................................................................................................... 1

15 U.S.C. § 78u-4(b)(1) .......................................................................................................... 6

**RULES**

Fed. R. Civ. P. 9(b) ................................................................................................................. 5

**REGULATIONS**

17 C.F.R. § 210.4-01(a)(1)..................................................................................................... 11

17 C.F.R. § 240.10b-5............................................................................................................. 1

## I.     PRELIMINARY STATEMENT

Lead Plaintiff Gregory Hurst ("Plaintiff") alleges Defendants[1] violated §§ 10(b) (15 U.S.C § 78j) and 20(a) (15 U.S.C. § 78t(a)) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants violated a simple and fundamental accounting principle: revenue may not be recognized until it is earned. In so doing, Defendants vastly overstated Enphase Energy, Inc.'s ("Enphase" or the "Company") financial condition between February 26, 2019 and June 17, 2020. The accounting violation was so massive that Enphase's revenues for FY 2019 were overstated by at least $273.8 million. Defendants' misconduct was brought to light on June 17, 2020 when Prescience Point Capital Management ("Prescience") released a 55-page report based on an in-depth investigation involving interviews with a forensic accountant, solar industry experts, and the primary distributors of Enphase's products, as well as a thorough examination of third-party data and Enphase's reported financial statements, and a private investigation which included statements of former Enphase employees. The day the report was released, Enphase's share price fell 26%.

Defendants' now move to dismiss Plaintiff's claims but miss the mark at every turn. First, Defendants fail to show that Plaintiff has not pleaded falsity. Seemingly acknowledging that Enphase did prematurely recognize deferred revenue, Defendants instead argue that the basic prohibition against premature revenue recognition is optional. As Plaintiff shows, however, it is not. Defendants next mischaracterize Plaintiff's claims as being "based entirely" on anonymous accounts, a version of the facts that conveniently matches more favorable legal standards. Defendants, however, ignore that these statements are corroborated by myriad other facts and that, therefore, they collectively plead falsity.

Second, Defendants fail to undermine the strong inference of scienter that Plaintiff's

---

[1] Defendants are Enphase Energy, Inc. ("Enphase" or the "Company") and the Individual Defendants, Badrinarayanan Kothandaraman and Eric Branderiz.

allegations, taken as a whole, establish. Precedent shows that the sheer magnitude of the accounting violations at issue here, coupled with the fact that the violations involved the premature recognition of revenue, gives rise to a strong inference that Defendants' accounting violations were, at a minimum, consciously reckless. Also supporting such an inference are allegations of insider trades – all in rapid succession immediately preceding the release of Prescience's report – which were entirely out of proportion with usual trading patterns; statements by former employees that directly implicate the Individual Defendants; and numerous other red flags that would have put Defendants on notice of Enphase's improper accounting.

Third, Defendants do not meaningfully contest that the Prescience report caused Enphase's share price to decline, indeed they concede as much. Defendants nonetheless argue that the report categorically could not serve as a corrective disclosure, no matter how Enphase's market price responded to it. Neither common sense nor case law support this position.

Accordingly, Defendants' Motion to Dismiss should be denied.

## II.     STATEMENT OF FACTS

### a. Enphase's fall and "magic" recovery.

Enphase is an energy technology company that primarily produces microinverters. ¶¶ 2, 39.[2] Prior to the class period, Enphase spent years perched on the brink of collapse. ¶¶ 40, 43, 49. Enphase cut costs aggressively, but its financial position did not improve. ¶¶ 42, 44, 46–49, 52. Finally, on August 8, 2017, Enphase's longtime CEO resigned. ¶ 50.

Defendant Badrinarayanan Kothandaraman was named as Enphase's CEO on September 6, 2017, ¶ 53, and the Company appeared to turn around immediately, ¶ 58. Kothandaraman boldly vowed that he would make the faltering Company profitable within his first 18 months and that he would achieve: 30% gross margins, an operating expenses to revenue ratio of 20%, and 10% operating margins by Q4 2018. ¶ 57. In the midst of Enphase's remarkable turnaround,

---

[2] Citations to "¶" are to the Amended Class Action Complaint (ECF 52) (the "AC").

however, its longtime CFO Bert Garcia suddenly resigned, ¶ 61, eventually to be replaced by Defendant Eric Branderiz, ¶ 37.

### b. Enphase's explosive growth.

The Company continued to defy the odds with Kothandaraman at the helm. In Q4 2018, Enphase reported $92.3 million in revenue, an 18% sequential increase, ¶ 66, and for 2018 as a whole the Company reported $316.159 million in revenue with gross margins of 29.9%, ¶ 67. The remarkable expansion continued in 2019: Enphase reported revenue and GAAP gross margins of: $100.2 million and 33.3% in Q1, ¶ 68, $134.1 million and 33.8% in Q2, ¶ 69, $180.1 million and 35.9% in Q3, ¶ 70, and $210 million and 37.1% in Q4, ¶ 72. All told, in 2019 the Company reported $624.333 million in revenue, nearly double what it reported in 2018. ¶ 73. The upward trend appeared to continue into 2020, with Enphase reporting $205.5 million in revenue and gross margins of 39.2% in Q1 2020. ¶ 76.

### c. The Prescience Report reveals the truth to the market.

On June 17, 2020, Prescience Point Capital Management ("Prescience"), an investment firm with a track record of uncovering fraud, ¶¶ 77–80, published a 55-page report exposing the inflation in Enphase's financial reporting, ¶ 82. Prescience's findings were based in part on the work of private investigators who interviewed former employees of Enphase's Bangalore, India office, ¶ 84, as well as Prescience's own interviews with solar industry experts, the primary distributors of Enphase's products, and a forensic accountant, and further examination of Enphase's financials, industry datasets, and online information sources, ¶ 85.

Prescience showed that Enphase's near-doubling of revenue between 2018 and 2019 did not add up. Enphase's expansion was primarily driven by increased revenue from the U.S. market. ¶ 98. However, based on third-party market share figures, the U.S. market grew by only 15.4% during this period. ¶ 100. For Enphase to have grown its revenue twofold, it therefore would necessarily have had to gain market share, but the independent figures showed Enphase was actually *losing* market share to its competitors. ¶¶ 101–04. Prescience contacted six distributors who accounted for nearly 70% of the U.S. market. ¶¶ 111–12. While the distributors

reported increased purchases of Enphase products, none reported increases anywhere close to the near-doubling Enphase was reporting in its public filings, and multiple distributors did not believe that Enphase had doubled its revenue. ¶¶ 112–14.

Prescience's report similarly examined Enphase's gross margins and concluded that these figures were also inflated. Enphase should have faced higher unit costs because of a 10% tariff on solar components imported from China that went into effect in September 2018, and subsequently increased to 25% in June 2019. Yet, despite nearly all of its manufacturing being based in China, and under the control of third parties, Enphase actually reported decreases in its unit costs. ¶¶ 116–20.

The report provided an explanation for the discrepancies in Enphase's financials: starting in 2018 and continuing into 2020, Enphase had improperly recognized deferred revenue prematurely, before it was earned, in order to inflate its current revenue figures, ¶¶ 121, 128, 136, 152–54, in what former employees called a "pyramid scheme" directed by Defendants Branderiz and Kothandaraman, ¶¶ 130–31, 153–54, 233–36. Using third-party market share figures and its findings from interviews with Enphase's U.S. distributors, Prescience calculated that Enphase's U.S. revenue growth from 2017–19 should have been just 1.7%, and therefore Enphase's 2019 reported U.S. revenue was overstated by $273.8 million, or 47.7%. ¶¶ 138–40. Prescience also showed that Enphase's Q4 2019 and Q1 2020 reporting implied a $49.9 million imbalance between assets and liabilities and that $49.9 million had been improperly allocated to accounts receivable on Enphase's balance sheet, ¶¶ 145–48, and that the record gross margins Enphase reported in this period were irreconcilable with its reported safe harbor sales, ¶¶ 155–58, 217. Finally, Prescience observed that Enphase had acquired a company co-founded by a vice president without disclosing the related-party transaction in SEC filings. ¶¶ 160–63.

Prescience also noted that, contrary to their regular practices and completely out of line with prior stock sales, Enphase insiders sold large amounts of their Enphase stock in the few weeks before Prescience released its report. ¶ 90. Four officers, including Branderiz, sold 254,097 shares in just four days in June 2020, significantly more than they had sold in the entire

period between January 2017 and May 2020, ¶ 224. Additionally, two Enphase directors, T.J. Rodgers and Benjamin John Kortlang, disposed of 58.7% and 65% of their shares respectively in roughly the week before Precience's report was released, ¶¶ 229–30. Meanwhile, Defendant Kothandaraman's compensation was heavily dependent on Enphase's performance and stock price. For instance, in 2018 75.6% of his compensation came from awards of stock, ¶ 238, and the number and value of the shares Kothandaraman received were dependent on Enphase's performance and share price, ¶¶ 239–41.

The day the Prescience report was released, Enphase's co-founder and Chief Products Officer Raghuveer R. Belur was attending a conference and was given the opportunity to explain Prescience's allegations. ¶ 249. Instead, Belur denied the allegations while evading any explanation as to why Enphase's revenue growth was out of step with third-party market share data or whether Enphase recognized deferred revenue prematurely. ¶¶ 250–56.

Enphase's stock price fell 26% in a single day, from $52.76 to $39.04, following the June 17, 2020 release of the Prescience report. ¶ 91. That same day, Gregory Hurst filed a complaint in this Court alleging violations of Sections 10(b) and 20(a) of the Exchange Act. ECF 1. On November 30, 2020, this Court named Hurst Lead Plaintiff, ECF 49, and on January 22, 2021, Plaintiff filed the AC, ECF 52. Defendants filed their Motion to Dismiss Lead Plaintiff's Amended Class Action Complaint ("MTD") on February 19, 2021. ECF 53.

### III.    LEGAL STANDARD

"In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff." *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1221 (N.D. Cal. 2015). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Securities fraud claims are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA and must be pleaded with particularity. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). However, courts "must be careful not to mistake heightened pleading standards for impossible ones." *In re Synchrony*

Case 5:20-cv-04036-BLF    Document 56    Filed 03/19/21    Page 12 of 32

*Fin. Sec. Litig.*, No. 20-1352, 2021 WL 560204, at *1 (2d Cir. Feb. 16, 2021). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading[ and] the reason or reasons why the statement is misleading". 15 U.S.C. § 78u-4(b)(1).

## IV.    ARGUMENT

Plaintiff has plausibly alleged securities fraud claims and Defendants' motion should be denied. "The basic elements of a Rule 10b–5 claim . . . are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Daou*, 411 F.3d at 1014. Defendants argue that Plaintiff has not pled the falsity, scienter, or loss causation elements of his claim. Defendants' arguments fail.

First, contrary to Defendants' weakly supported assertions otherwise, Plaintiff has pleaded material misrepresentations. Although certain accounting decisions do require judgment calls, it is well settled that prematurely recognizing deferred revenue – which Defendants do not dispute occurred – is actionable and is not a matter of "opinion." Further, Defendants' effort to undermine the AC by focusing solely on the anonymous Enphase employees cited in Prescience's report, while ignoring the many other corroborating facts, undermines their motion.

Second, Plaintiff has pleaded scienter. When evaluated holistically, rather than individually as Defendants incorrectly suggest, Plaintiff's allegations, which include enormous violations of accounting standards, unusual insider trading, statements by former employees, and numerous other red flags, create an inference of scienter that is at least as compelling as any competing inference.

Third, Plaintiff has easily met his burden of pleading loss causation because Enphase's share price plainly fell in response to the revelations in Prescience's June 17, 2020 report. Defendants' caselaw indicating that anonymous reports that rely solely on public information may not constitute corrective disclosures bypasses the facts that Prescience's report was not anonymous and did not rely on public information. Defendants' motion should therefore be denied in its entirety.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
No. 5:20-cv-04036-BLF                    - 6 -

#### a. Plaintiff has pleaded materially false statements of fact.

##### i. *Defendants' premature recognition of deferred revenue is an actionable GAAP violation, not a matter of "opinion."*

Defendants do not challenge whether Plaintiff has properly pled that Enphase bolstered its financials by prematurely recognizing revenue before it was earned. Instead, they assert that there was nothing wrong with this practice because it was an "accounting judgment[]" and therefore Enphase's "financial statements constitute statements of opinion." MTD at 9.

Defendants' argument does not withstand scrutiny. Some standards under GAAP require imprecise estimates and therefore rely on management's judgment calls, for instance estimating how many of a company's outstanding loans may ultimately prove uncollectable. *See Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 921-22 (N.D. Cal. 2015). However, none of the cases Defendants cite state that the actual practice at issue here, the premature recognition of deferred revenue, involves a judgment call under GAAP. *See id.* (explaining calculation of "bad debt reserves" is a matter of opinion because it "is based on flexible accounting concepts, which, when applied, do not always (or perhaps ever) yield a single correct figure." (internal quotations omitted)); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *13 (S.D.N.Y. Sept. 9, 2019) (court did not count prematurely recognizing revenue among the matters of accounting opinion and indeed found deferred revenue statements to be factual because: "the company either recognized revenue at the time of sale or it did not. It either deferred a portion of service revenue or it did not."); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 242–43 (S.D.N.Y. 2015) (company properly recognized revenue only after the products were delivered to customers, which the court stated "mirror generally accepted accounting principles" and the separate matter of judgment was determining whether future prices would remain fixed); *In re MF Glob. Holdings Sec. Litig.*, 982 F. Supp. 2d 277, 312 (S.D.N.Y. 2013) (discussed accounting standards on whether to take a valuation allowance against a deferred tax asset). One of Defendants' cases even reinforces that premature revenue recognition is a GAAP violation. *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1457–60, 1465 (N.D. Cal. 1996)

dealt separately with two issues: 1) the calculation of inventory reserves, which the Court found to be a "type[] of forecast[]" based on "accounting estimates", *id.* at 1457–60, and 2) premature revenue recognition, which the Court explained was typically a GAAP violation, but in this case the company properly recognized revenue upon delivery, drawing a contrast with Ninth Circuit precedent where "revenue was improperly recognized prior to delivery and prior to the execution of binding contracts with customers", *id.* at 1465.

It was neither a matter of opinion nor judgment for Defendants to fail to apply simple, basic accounting principles forbidding the premature recognition of revenue before it is earned. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("To be sure, the application of accounting principles often involves details and minutiae, but the accounting principle violated here boils down to the well-worn adage, 'Don't count your chickens before they hatch.'"). It is well and long settled in the Ninth Circuit that "it is a violation of GAAP to recognize revenue before it is earned." *Daou*, 411 F.3d at 1018; *see also Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1304 (C.D. Cal. 1996) (where defendants recognized sales before they were earned under GAAP was a material misrepresentation).

In *Daou*, plaintiffs alleged that a company inflated its financials by "reporting revenues before they were earned". 411 F.3d at 1012. Drawing on established caselaw, the Ninth Circuit explained that "*If [p]roperly pled, overstating of revenues may state a* claim for securities fraud, as under GAAP, revenue must be earned before it can be recognized." *Id.* at 1016 (quoting *Hockey v. Medhekar*, 30 F.Supp.2d 1209, 1216 (N.D.Cal.1998)) (alterations and emphasis original) (internal quotations removed). A complaint making such allegations "must allege enough information so that 'a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'" *Id.* at 1017 (quoting *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)).

Here, Plaintiff alleges that Enphase inflated its revenue and gross margin figures by improperly recognizing deferred revenue before it was earned, *e.g.* ¶¶ 121–41, and demonstrates

that the violation was not minor. In 2019 "$205.3 million of Enphase's reported U.S. revenue was non-existent", ¶ 137, along with $44.4 million in safe harbor revenue, such that Enphase's actual U.S. revenue that year was 47.7% lower than reported, ¶ 140. "Certainly, prematurely recognizing millions of dollars in revenue is not minor or technical in nature." *Daou*, 411 F.3d at 1020. Similar to this case, the plaintiff in *In re Obalon Therapeutics, Inc.*, No. 3:18-CV-0352-AJB-WVG, 2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) claimed that defendants inflated current "revenues by prematurely recording future revenues" while defendants challenged that plaintiff had "not explain[ed] what [defendants'] accounting decision was, and why and how that decision was outside a zone of reasonable accounting practices." *Id.* at *8 (internal quotations removed). Siding with plaintiff, the Court explained that premature revenue recognition was a GAAP violation and that the resulting overstatement of revenue by 5%, far less than the 47.7% inflation alleged here, was not minor or technical. *Id.*

While Defendants challenge that Plaintiff has not offered a "basis" for questioning Enphase's purported revenue growth, in reality he has. During the period where Enphase claims its U.S. sales grew by 138.4%, the U.S. residential solar market increased only 15.4%. ¶ 100. It is not a "difference of opinion" but simple math that if Enphase's sales doubled, it would control a higher percentage of the U.S. market if the overall market increased only modestly. ¶ 100–04. Independent figures, however, show Enphase's market share actually *fell* from 2017–2019. ¶ 104. Defendants offer no alternate explanation for how this could be possible; they simply insist that the discrepancy amounts to a "difference of opinion". MTD at 12.

For similar reasons, Plaintiff has adequately alleged that Defendants' gross margins were inflated. In arguing to the contrary, Defendants ignore Plaintiff's actual allegations, which state that Enphase was reporting improved gross margins at a time when tariffs would have been caused a 10-25% increase in its unit costs which Enphase would have had little ability to offset. ¶¶ 117–20. Defendants instead rely conclusory factual assertions such as that Enphase's financial statements "have not been questioned by anyone other than Plaintiff and Prescience". MTD at 11. The AC establishes that Prescience Point questioned Enphase's financials, but does not state

that no one else did. Whether others have expressed concerns may be revealed through discovery. Nonetheless, the AC points to at least four other sources who raised questions about Enphase's figures. *See* ¶¶ 105–08, 113, 114. Defendants' conclusory assertions are therefore unsupported by the facts and should be rejected at the motion to dismiss stage.

In any case, Defendants' suggestion that a defendant can avoid liability under the federal securities laws simply by declining to ever restate its financials lacks merit. Courts have repeatedly pointed out the commonsense problem with Defendants' position, namely that it "would create a huge fox-guards-the-chicken-house loophole in our private securities law enforcement." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245–46 (N.D. Cal. 2008) ("the fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case . . . To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements." (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002))); *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987 (N.D. Cal. 2007) ("the lack of restatement or an unqualified independent auditor's opinion does not absolve or shield a defendant from liability."); *In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-cv-5146-CAS (JEMx), 2019 WL 1512269, at *10 (C.D. Cal. Mar. 25, 2019) ("many courts have found adequate allegations of scienter even when the defendants had obtained 'clean' audit opinions from their independent auditors and had never restated their financial statements"). Enphase's decision not to restate its financials has no bearing on their falsity.

Finally, Defendants contend that the AC "does not offer any particularized facts" as to why Enphase's reported safe harbor revenues and accounts receivable in Q1 2020 "were not accurate or otherwise reasonable accounting judgments." But Plaintiff has pointed out that the safe harbor revenue was irreconcilable with the record gross margins Enphase reported in Q1 2020, ¶¶ 155–59, 217, that Enphase's reporting of $52.9 million to accounts receivable from safe harbor deliveries created a $49.9 million imbalance on its balance sheet, and that accounts

receivable objectively should not have been affected by deliveries of products already paid for, ¶¶ 144–49, 214. Accordingly, Plaintiff has adequately stated the falsity of Enphase's financial statements. *See* 17 C.F.R. § 210.4-01(a)(1) ("Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate"); *Montage Tech.*, 78 F. Supp. 3d at 1224 ("Financial statements filed with the SEC which are not consistent with GAAP are presumed misleading.").

                *ii.    Plaintiff has adequately pleaded an undisclosed related party transaction.*

The AC alleges that Enphase acquired a company co-founded by Enphase Vice President Jithender Majjiga without disclosing the transaction as required by GAAP. ¶¶ 160–63, 172. Contrary to Defendants' suggestion, Majjiga, as an executive officer, was plainly a related party. *See Montage Tech.*, 78 F. Supp. 3d at 1224 (explaining that a related party is one who controls or "is controlled by" an entity and finding related party transaction where company's director of engineering was a majority owner of another company). Defendants challenge the materiality of their failure to disclose this related party transaction, but cannot show, as they must at the motion to dismiss stage, that the omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance*." Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 791 (S.D.N.Y. 2020) (quoting *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).

                *iii.    The statements of former employees are sufficiently corroborated by other facts.*

Defendants question the reliability of Plaintiff's factual allegations by overemphasizing Prescience's and the AC's reliance on the statements of anonymous former Enphase employees. Defendants' position is flawed.

First, the primary source the AC relies on, Prescience and its founder Eiad Asbahi, are not anonymous at all. ¶¶ 77–78, 80; *see In re China Educ. All., Inc. Sec. Litig.*, No. CV 10-9239 CAS JCX, 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011) (explaining report authored by a named investment firm with short position "does not implicate the same skepticism as a

'traditional' anonymous source"); *McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123-24 (S.D.N.Y. 2013) ("The majority of courts . . . have held that a short-seller report" does not implicate anonymity concerns). Even if it was, the AC establishes the basis for Prescience's knowledge by explaining the investigatory methods it used, *e.g.* ¶¶ 84–85, and therefore adequately demonstrates its reliability, *see Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1111 (C.D. Cal. 2012) ("Plaintiffs allege in detail the process [an investment firm] used to reach its conclusions", which included hiring third party investigators).

Second, the former employees' statements are adequately corroborated. Defendants' claim that Prescience's report relied "entirely on accusations from unidentified 'former employees'", MTD at 15, is untrue, *e.g.* ¶¶ 85, 100–04, 109–20, 138–40, 144–49, 156–63. However, Defendants' argument wholly depends on this misguided attempt to write-off the remainder of Prescience's investigation and recast the AC as relying solely on the former employees' statements because the facts Defendants ignore reinforce falsity. Defendants cite *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), for instance, but omit the crucial distinction the Ninth Circuit – following the standard the Second Circuit established in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) – made in that case: "Where a complaint relies on both confidential witnesses *and other factual information*, such as documentary evidence, the plaintiffs 'need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.'" *Id.* at 995 (quoting *Daou*, 411 F.3d at 105) (emphasis added). The standard Defendants advance, meanwhile, that witnesses must be "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" applies "where . . . such additional evidence is absent." *Id.* (internal quotations omitted). Another case Defendants heavily rely on, *Miao*, likewise betrays them. In *Miao*, the Court explained that "when independent [adequately pled] factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened." 442 F. Supp. at 798 (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) (alteration original)). The Court

further elaborated: close scrutiny is needed "where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration. . . . But, where courts have found that well-pled independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports, courts have sustained such complaints." *Id.* at 801. Here, the statements of Enphase's employees were just part of an investigation that also used independent research, interviews with, among others, the primary distributors of Enphase's products, and simple math to bring to light additional evidence of Enphase's inflated financials. ¶ 85.

Defendants' cases, meanwhile, involve exclusive reliance on confidential sources without corroborating facts. *SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C 18-02902 WHA, 2019 WL 2491935, at *5 (N.D. Cal. June 14, 2019) (claim that relied on confidential witnesses dismissed where witnesses' statements were "not sufficiently supported" by other alleged facts); *Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK, 2020 WL 7261314, at *10, *15 (N.D. Cal. Dec. 10, 2020) (dismissing claims that depended entirely on confidential witness statements where plaintiff could "point[] to no other allegations" in the complaint supporting falsity); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) (dismissing claim that relied entirely on confidential witnesses).

More informative is *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214 HB, 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014). There, an investment firm with a short position published a report revealing that the 74% revenue growth Longwei reported in its 10-K, purportedly driven by the sale of gasoline from three facilities in China and which "sharp[ly] contrasted" with what its competitors were reporting, was fraudulent. *Id.* at *1. The firm's report involved, in part, "interviews with [anonymous] local residents" who lived near Longwei's facility, as well as surveillance of Longwei's facilities and the firm's observations of "discrepancies" in Longwei's reported revenues to the SEC and to Chinese regulators. *Id.* at *3. Because the additional evidence was "consistent" with the anonymous sources' statements, the Court explained that the "independent … factual allegations corroborate [the] confidential

source[s'] statements." *Id.* (quoting *Glaser*, 772 F.Supp. at 590) (alterations original). Therefore, the Court found that the interviews with unnamed local residents, "[t]aken together" with the other evidence compiled in the report and complaint, were "more than sufficient for Plaintiffs' claims to survive dismissal." *Id.*

Likewise, in *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012), two investment firms released reports concluding, "based [in part] on discussions with the company's customers, industry experts, and plant managers, and two former executives", that a company that was apparently outperforming its "industry peers" was actually fabricating revenue. *Id.* at *4 (internal quotations omitted). The Court determined that although the firms used anonymous investigators, the reports did not rely on "a 'confidential' source to a degree that undermine[d] particularity of plaintiffs' pleadings" and that the firms' findings of inconsistencies in the company's financial filings "tend[ed] to corroborate the findings of" the anonymous sources. *Id.* at *13–14.

Here, Prescience's other factual findings corroborate and are reinforced by the former employees' statements. *See id.* at *14 (inconsistent financials "corroborate the [anonymous sources] . . . The reverse is also true: The findings of the investigators corroborate the [inconsistent financials]"). For instance, Prescience interviewed the primary distributors of Enphase's products and, based on the volume of sales they reported, conducted simple math to demonstrate that Enphase's reported revenue growth did not reconcile with its market share and what its customers were reporting. ¶¶ 100–04, 109–14, 138–40. These findings, as well as the statements by distributors, ¶¶ 113–14, track closely with the former employees' statements, for example that "the revenue earned, claimed in the balance sheets, does not add up with the kind or quantum of work we are doing". ¶ 124. Defendants do not explain why Prescience's math is wrong, or address the statements given by distributors. They simply ignore these facts.

Further, any suggestion that Prescience's report is unreliable, or that the allegations therein can be disregarded at the motion to dismiss stage, is premature. *In re China Educ. All.*, 2011 WL 4978483, at *4 (reliability of report "is 'a factual dispute not appropriate for resolution

at this stage.'" (quoting *Henning v. Orient Paper, Inc.*, No. CV 10-5887-VBF AJWX, 2011 WL 2909322, at *1 (C.D. Cal. July 20, 2011)); *see also In re Synchrony*, 2021 WL 560204, at *7 ("The anonymity of the former employees corroborating [plaintiff's] allegations does not defeat the plausibility of the allegations . . . Whether these former employees will prove to be credible and percipient sources is not at issue at this stage of the litigation.").

Finally, Defendants argument that the former employees failed to "provide[] any detail" about how Enphase's financials were inflated, MTD at 13, is not supported by the statements of the employees identifying Defendants' improper recognition of deferred revenue. *See* ¶¶ 18, 128, 130, 135–36, 152–54. In any case, a "plaintiff need not allege specific examples of accounting fraud to survive motion to dismiss," but rather must show "whether the GAAP violations constituted a 'significant inflation of revenue.'" *SEB*, 2019 WL 2491935, at *5 (quoting *Daou*, 411 F.3d at 1016–17)). Plaintiff has shown Enphase's revenue was significantly inflated.

### b. Plaintiff has adequately pleaded scienter.

Taken as a whole, Plaintiff's allegations give rise to a strong inference of scienter. Defendants incorrectly elevate the pleading standard for scienter to show Plaintiff has not met it. They state that Plaintiff has alleged no "particularized" facts that create a strong inference of scienter. MTD at 15. Yet, even "[v]ague or ambiguous allegations are [] properly considered" in the scienter analysis. *S. Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Further, the question is not whether any single allegation independently creates an inference of scienter but "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference" of scienter. *Daou*, 411 F.3d at 1022; *see also New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) ("[Courts] conduct a 'holistic' review of . . . allegations to determine whether [individually] insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness"). The Supreme Court has explained that "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences," rather, scienter is well-pleaded "if a reasonable person would deem the inference of

scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (internal quotations and citations omitted); *Communs. Workers of Am. Plan for Emples. Pensions & Death Bens. v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007) ("[A] a tie goes to the Plaintiff. If the Plaintiff presents facts from which an inference of scienter may be drawn, and that inference is as likely as any nonculpable explanation, the complaint will survive a Rule 12(b)(6) challenge under the PSLRA."). In establishing this inference, "[a] plaintiff may [] rely on circumstantial evidence". *In re LDK Solar*, 584 F. Supp. 2d at 1246.

Plaintiff has alleged facts supporting a strong inference that Defendants intentionally or knowingly issued misstatements. Taken together, allegations regarding the sheer magnitude of the GAAP violations, insider trading and stock-based compensation, statements of former employees directly implicating the Individual Defendants, and other red flags create an inference of scienter that is at least as compelling as any inference that Defendants were unaware that, *i.e.*, Enphase's revenue was overstated by $273.8 million. ¶¶ 138–40.

> i.  *The enormity of Enphase's GAAP violations contributes to a strong inference of scienter.*

The sheer magnitude of Enphase's alleged violation of the basic accounting principle that revenue cannot be recognized before it is earned mightily contributes to a strong inference that Defendants acted with Scienter. "[S]ignificant violations of GAAP standards can provide evidence of scienter so long as they are pled with particularity." *Daou*, 411 F.3d at 1016; *see also CSK Auto Corp.*, 525 F. Supp. 2d at 1124 ("the extensive and systematic nature of the accounting irregularities would not likely have escaped the attention of the CEO and CFO. This is more than a case of isolated incidents or transactions."); *Lea v. TAL Education Group*, No. 19-3549, 2020 WL 6937475, at *5 (2d Cir. Nov. 25, 2020) (drawing inference that CEO and CFO "would have knowledge" of fraud "of this magnitude by virtue of [their] position[s]."). Here, Enphase's premature recognition of deferred revenue resulted in, at a minimum, a $273.8 million overstatement of revenue in 2019. ¶¶ 138–40. The enormity of this violation strongly indicates

Defendants were at least consciously reckless in failing to question Enphase's massive revenue growth. *See Silver Wheaton*, 2019 WL 1512269, at *9 (finding "a potential tax liability of USD$207 million" to be "of such a magnitude that it cannot be considered merely a 'minor or technical' violation."); *see also Longwei Petroleum*, 2014 WL 285103, at *4 (explaining company's "sudden increase in revenues" put officers on notice that figures were false).

Additionally, "courts have recognized that accounting manipulations involving premature revenue recognition . . . are especially indicative of conscious misbehavior since such violations 'do not commonly occur inadvertently,' but instead 'suggest a conscious decision to improperly recognize revenue.'" *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006) (quoting *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, *20 (E.D.N.Y. Sept. 19, 2005)). For instance, in *In re MicroStrategy*, the Court held that the magnitude (revenue was overstated by $66 million) and the nature of a company's GAAP violation produced a strong inference of scienter. 115 F. Supp. 2d at 635–37. The Court explained that GAAP provisions concerning revenue recognition were "not complex, as they reduce, in essence, to the simple principle that revenue cannot be recognized for unexecuted contracts" and that "violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious." *Id.* at 637 (internal quotations omitted). Accordingly, the fact that Defendants prematurely recognized revenue in violation of a basic accounting principle, resulting in enormous inflation of Enphase's revenue, strongly signals Defendants' scienter. At the very least, the violation establishes Defendant Enphase's scienter. *See TAL Education Group*, 2020 WL 6937475, at *5 ("[W]hen the magnitude of the fraud is dramatic, it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." (internal quotations omitted)).

> ii. *Unusual stock sales by Enphase insiders and Kothandaraman's compensation scheme contribute to a strong inference of scienter.*

Stock sales by numerous Enphase insiders, which occurred in a short period of time immediately preceding the release of Prescience's report and were out of proportion with the

insiders' former trading patterns, ¶¶ 224–30, support an inference of scienter with respect to Defendants Branderiz and Enphase. In *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), the Ninth Circuit provided three factors for evaluating whether insider sales evidence scienter: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* at 938 (quoting *In Re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).

Here, Defendant Branderiz sold 100,249 shares for $5.4 million on June 3, 2020, ¶ 225, while three other executives sold 153,848 shares for $9.2 million, ¶¶ 226–28. In the following weeks, three Enphase directors also made significant sales: T.J. Rodgers sold 2.2 million shares, 58.7% of his holdings, ¶ 229, Benjamin John Kortlang sold 180,000 shares, 65% of his holdings, ¶ 230, and Joseph Ian Malchow sold 6,250 shares, ¶ 231. Enphase's largest shareholder, meanwhile, sold all of his shares, over 13.5 million, in one day: May 20, 2020. ¶ 232.

As for the timing of the sales, the four officers sold in just a four-day period, June 1 to June 4, 2020, ¶ 224, while the directors sold in the following weeks just prior to the June 17 release of Prescience's report, ¶¶ 229–31. For comparison, in *Am. W. Holding*, the insiders' trades "occurred in succession over a three month period". 320 F.3d at 939.

Finally, because these trades were out of line with the insiders' prior trading history, the "sudden flurry of massive insider trading . . . after an extended period of inactivity, appears unusual." *Id.* at 940. The four executives sold just 187,508 shares between January 2017 and May 2020, yet in a four-day period just weeks before Prescience's report, suddenly sold 254,097 shares. ¶ 224. The insiders' stock sales at a minimum strongly contribute to an inference of scienter regarding Enphase and Branderiz. *See Communs. Workers of Am. Plan for Emples. Pensions & Death Bens. v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007) (finding that even where sales did not independently establish scienter "they d[id] add somewhat to the plausibility of a scienter inference when all of the facts . . . are taken into account.").

*Daou* demonstrates the flaws in Defendants' arguments. There, defendants claimed that any inference of scienter to be drawn from their trades was undermined because they "did not sell at the height of [the company's] stock prices". 411 F.3d at 1024. The Ninth Circuit, disagreeing, explained that insider trading evinces scienter where the trades are "unusual, well beyond the normal patterns of trading by th[e] defendants." *Id.* at 1022–23 (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999)). The defendants' sales still took place at suspicious moments, and therefore supported scienter. *Id.* at 1024. Further contributing to the Court's finding was that *non-defendant* insiders also sold millions of shares during the class period. *Id.*

Defendants' explanation for the insiders' sudden sales - that Prescience Point sat on its research report awaiting suspicious trades, apparently knowing somehow that Enphase executives would suddenly, in a four-day span, sell more shares than they had in several years, and that certain directors would, at virtually the same time, sell off 58.7% and 65% of their holdings – is specious. Furthermore, Defendants suggest that Plaintiff's scienter allegations are "*backwards*" because, as it turned out months later, the insiders would have been better off not preemptively selling their shares. MTD at 19. Yet, Defendants' competing inferences completely fail to account for why so many unusual sales happened in just a few weeks or how Defendants' hindsight awareness of the prematurity of their sales retroactively erased their scienter. These inferences are by no means stronger than the competing inference, which *does* account for the timing of the sales, that the insiders had learned investigators were digging into Enphase's accounting operations. *See CSK Auto Corp.*, 525 F. Supp. 2d at 1120 ("[T]ie goes to the Plaintiff").

Also supporting the scienter of Defendants Kothandaraman and Enphase is the level to which Kothandaraman's compensation was dependent on Enphase's performance and share price. That Kothandaraman did not also sell shares in June 2020 is of no moment. *See In re LDK Solar*, 584 F. Supp. 2d at 1247 n.6 ("[I]t is unnecessary for defendants to engage in insider trading . . . to establish scienter). In *In re LDK Solar*, a court in this district found allegations that

"the false statements allowed [the company] to inflate its stock price and therefore increase defendants' net worth" contributed to inference of scienter. 584 F. Supp. 2d at 1247. The AC alleges that Kothandaraman's compensation was heavily dependent on Enphase's performance. ¶¶ 237–47. In 2018, over 75% of his compensation was comprised of awards of stock contingent upon reaching performance targets. ¶ 238. The situation here is therefore similar to *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002). There, the First Circuit found allegations that defendants had "financial incentives to exaggerate earnings" because their "compensation depended on the company's earnings" supported scienter when coupled with allegations that the company's survival depended on "turn[ing] the company around in one year" and that "individual defendants were the ones who set [a] target sales goal of $25 million". *Id.* at 83–84. Here, Enphase was struggling when Kothandaraman became CEO, ¶¶ 51, 55, and he vowed to reach concrete, numerical targets by Q4 2018, ¶ 57. Because his highly skewed compensation and the necessity of hitting targets created "incentives to exaggerate earnings [that went] far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter." *Aldridge*, 284 F.3d at 83; *see also In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 737-38 (S.D. Ohio 2006) (collecting cases and holding "facts tying [defendants'] compensation to company performance" supported scienter).

iii.   *Statements directly implicating Defendants contribute to a strong inference of scienter.*

Statements by Enphase's former employees contribute to the inference that Defendants were knowingly involved in fraud. In *Daou*, the Ninth Circuit held that anonymous statements by a company's former staff members indicating that defendants "personally directed the violations of . . . GAAP in order to artificially inflate revenues" were "probative of scienter". 411 F.3d at 1023. By comparison, Prescience's report quoted former employees as stating that Enphase's deferred revenue scheme was directed by the Individual Defendants. *E.g.* ¶ 130 ("But what [Chief Accounting Officer Mandy] Yang and Eric [Branderiz] under Badri Kothandaraman are doing is overstating income by treating deferred revenue as earned revenue by recognizing

revenue before it is actually earned"); *see also* ¶¶ 131, 150. These statements certainly contribute to an inference of scienter and detract from the strength of competing inferences. *See CSK Auto Corp.*, 525 F. Supp. 2d at 1124 (holding that even though confidential witness statements were "somewhat lacking in detail" and did not independently establish scienter, "the confidential witnesses confirm[ed] the widespread nature of accounting irregularities within the company. [And s]ome of the witnesses attribute[d] knowledge directly to Defendant").

> *iv.   Numerous red flags contribute to a strong inference of scienter.*

The AC alleges numerous additional facts that "should have prompted further investigation." *Longwei Petroleum*, 2014 WL 285103, at \*4 ("[S]cienter may be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false." (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007)). First, as Defendants themselves point out, Prescience made initial allegations of improper deferred revenue accounting in 2018, MTD at 20, yet Defendants apparently allowed the practice to continue. Second, the rapid turnover of Enphase's finance and accounting staff in India, ¶¶ 89, 122, and the unusually timed resignation of former CFO Bert Garcia, ¶¶ 61–62, at a minimum show further investigation was warranted. *In re China Educ. All.*, 2011 WL 4978483, at \*6 (finding "rapid turnover of [] CFOs during the class period" contributed to scienter inference). Third, because elevated accounts receivable days often signal fraud, Enphase' dramatic increase in this measure was a red flag to Defendants. ¶¶ 257–60. Fourth, Enphase brought on Ahmad Chatila, a former executive of a now-bankrupt solar developer which was the subject of SEC and Department of Justice investigations for misleading investors, without disclosing it had done so. ¶¶ 93–96. These facts support an inference that Defendants acted at least "with deliberate recklessness." *Daou*, 411 F.3d at 1022. Further supporting scienter are Belur's evasive responses when confronted with Prescience's investigation. *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1143 (N.D. Cal. 2013) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter" (quoting *In re Nature's Sunshine Prods. Sec.*

*Litig.*, 486 F. Supp. 2d 1301, 1311 (D. Utah 2007)). Additionally, while Defendants argue that Belur's statements do not support scienter because he explained that Enphase increased its gross margins by "'increase[ing] its "leverage" with suppliers' and work[ing] to bring costs down", MTD at 17, this explanation is directly at odds with Defendants' own (factually conclusory) assertion that the gross margin increase was caused by "increased sales of [the] new IQ 7 microinverter that has significantly higher margins", MTD at 11.

Therefore, when taken as a whole, Plaintiff's allegations create a strong inference of scienter at least as compelling as any competing inferences.

### c. Plaintiff has adequately pleaded Loss Causation.

To plead loss causation, "a plaintiff need only allege that the 'revelation of fraudulent activity,' rather than changing market conditions or other unrelated factors, proximately caused the decline in defendant's stock price." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020). "This inquiry requires no more than the familiar test for proximate cause. To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss" and "[t]hat a stock price drop comes immediately *after* the revelation of fraud can help to rule out alternative causes." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–54 (9th Cir. 2018) (citations omitted). Plaintiff has shown as much, ¶¶ 26, 271, and Defendants concede as much, MTD at 2 ("This report ***caused a short-lived stock drop*** of more than 20% (from $52.76 to $39.04) on June 17, 2020" (emphasis added)); *id.* at 6 (the "Report led to a temporary stock drop from $52.76 on June 16, 2020 to $39.04 on June 17, 2020"); *id.* at 7 ("Other than the temporary blip ***caused by*** the Prescience Report. . ." (emphasis added)).

Defendants instead argue that short reports categorically cannot constitute corrective disclosures, such that one should apparently ignore the undisputed fact that Prescience's report caused a 26% one day drop in Enphase's share price. ¶ 91. Defendants rely on inapposite cases and vastly oversimplify the law. The cases Defendants cite found loss causation lacking because the reports in question were anonymous and the information in the reports was entirely public. *See Grigsby*, 979 F.3d at 1203 (blog post "was written by an anonymous short-seller with no

expertise beyond that of a typical market participant who based the article solely on information found in public sources."); *Miller v. PCM, Inc.*, No. LACV 17-3364-VAP (KSx), 2018 WL 5099722, at *11 (C.D. Cal. Jan. 3, 2018) (blog post was "anonymous" and "was derived entirely from information that was publicly available"); *Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-CV-01795-WHO, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) (blog post was "anonymous" and all the information was already public); *In re Herbalife, Ltd. Sec. Litig.*, No. CV 14-2850 DSF JCGX, 2015 WL 1245191, at *5 (C.D. Cal. Mar. 16, 2015) (report was "based on publicly available information"); *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (sources "already public").[3]

First, Prescience's report was not anonymous. *See* ¶¶ 77–78, 80; *In re China Educ. All.*, 2011 WL 4978483, at *4 (agreeing that a "report authored by Kerrisdale Capital was not authored by an anonymous author; it was authored by Kerrisdale Capital"). Second, Prescience's report largely consisted of information that was not previously public. *See TAL Education Group*, 2020 WL 6937475, at *5 ("[M]uch of the information in the report, including numerous interviews of former employees . . . was not public information . . . [or] was not readily accessible to investors"). The 2018 report, meanwhile, contrary to Defendants' argument otherwise, MTD at 20, could not logically have served as a corrective disclosure for fraud that had yet to inflate figures not yet reported. In any case, a recent Ninth Circuit decision threw Defendants' caselaw into doubt by holding that reports based solely on public information can serve as corrective disclosures. *See Sayce v. Forescout Technologies, Inc.*, No. 20-CV-00076-SI, 2020 WL 6802469, at *5 n.8 (N.D. Cal. Nov. 19, 2020) ("[T]he *In re BofI* court rejected the defendant's request to adopt a bright line rule that disclosures based on publicly available

---

[3] Defendants also quote *Or. Pub. Emples. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014). The case is out of place. Defendants' quoted language does not concern a short report at all, but rather a company's announcement of a Department of Education "concern." *Id.*

information can never constitute corrective disclosures, finding instead that a 'flexible' approach was the better course.").

That decision, *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020) is informative. There, the Court found loss causation stemming from a whistleblower lawsuit, but not with respect to 8 anonymous blog posts by short sellers. *Id.* at 792–97. The Court "decline[d] to categorically disqualify the [] blog posts as potential corrective disclosures," even though they were based on public information, *id.* at 795, but found against loss causation nonetheless because other indicators suggested that investors would have taken these anonymous posts – which were scattered over a 7 month period and disclaimed their own accuracy – "with a healthy grain of salt", *id.* at 797. By contrast, Prescience, a firm with an established reputation, ¶¶ 77–80, put its name to a 55-page report describing its investigatory methods and findings, ¶ 84–85, affirmed that "all information contained herein is accurate and reliable", ¶ 83, and even called on regulators and Enphase's auditor to check its work, ¶ 86. Prescience's report is therefore closer to the whistleblower's "descriptions of wrongdoing" in *BofI* which were "highly detailed and specific". 977 F.3d at 792. Further, "[t]he fact that BofI's stock price plunged by more than 30% . . . immediately after the market learned of [the whistleblower's] allegations", just as Enphase declined 26% the day Prescience released its report, "bolsters the inference that the market regarded his allegations as credible. A price drop of that magnitude would not be expected in response to [] allegations perceived as unworthy of belief." *Id.* Finally, that the whistleblower's "motivations for coming forward", like Prescience's, "may not have been entirely pure, as he lodged his allegations in a lawsuit seeking money . . . [wa]s just one factor among many that market participants would have weighed in deciding how much credence his claims deserved." *Id.* Accordingly, Plaintiff has more than shown that the revelations in Prescience's report caused a 26% drop in Enphase's stock price and, since the report is not categorically barred from serving as a corrective disclosure, Plaintiff has established loss causation.

Defendants' further suggestion that future movements in Enphase's share price retroactively erased the causes of its June 17, 2020 decline are even farther afield, as a matter of

logic and law. Defendants cite *Wochos v. Tesla, Inc.*, No. 19-15672, 2021 WL 246210 (9th Cir. Jan. 26, 2021), but there the Ninth Circuit explained that an immediate rebound following only a "'modest' drop" of less than 4% undermined the inference that the disclosure, as opposed to some other market condition, caused the drop. Here, though, Plaintiff has properly "allege[d] that the share price *fell significantly*". *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010)) (emphasis original); *see also Acticon AG v. China N. E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 39–40 (2d Cir. 2012) ("At this stage in the litigation, we do not resolve why [company's] share price rose after its initial fall and instead, drawing all reasonable inferences in favor of [plaintiff], assume that the price rose for reasons unrelated to its initial drop"); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*, 411 F. Supp. 2d 1172,1178 (N.D. Cal. 2005) (finding sufficient allegations "that there was a steep drop" in share price after truth revealed); *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG, 2013 WL 5486762, at *24 (C.D. Cal. Oct. 1, 2013) (finding loss causation despite recovery where "Defendants d[id] not offer any other explanation for the[] declines"). Furthermore, Defendants' suggestion that the operation of the PSLRA's 90-day bounce back period may "eliminate[]" the class's damages is misleading. The fact that Enphase's share price recovered such that the mean price in the 90-day bounce back period exceeded the price on June 17, 2020 may limit the *size* of the class, but persons who sold during the class period still suffered damages under 15 U.S.C. § 78u–4(e)(2) and these class members have a right to see their claims vindicated. *See Acticon AG*, 692 F.3d at 39–41 ("[A] recovery does not negate the inference that [plaintiff] has suffered an economic loss.").

### d. Plaintiff has adequately alleged a Section 20(a) claim.

Plaintiff has pleaded a 10(b) claim, and his 20(a) claim should therefore also survive dismissal. *See In re LDK Solar*, 584 F. Supp. 2d at 1252.

### V. CONCLUSION

For the reasons stated above, the Court should deny Defendants' MTD in its entirety.

Dated: March 19, 2021          Respectfully submitted,


By:  */s/ Jacob A. Walker*
Jacob A. Walker (CA Bar No. 271217)
**BLOCK & LEVITON LLP**
260 Franklin St., Suite 1860
Boston, MA 02110
Tel.: (617) 398-5600
Fax: (617) 507-6020
jake@blockleviton.com

Whitney E. Street (CA Bar No. 223870)
**BLOCK & LEVITON LLP**
100 Pine Street Suite 1250
San Francisco, CA 94111
Tel.: (415) 968-1852
Fax: (617) 507-6020
whitney@blockleviton.com

*Attorneys for Lead Plaintiff*